UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SHANE ADAIR VICARS,

        Petitioner,

   v.

SECRETARY, CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION,

        Respondent.

No. 2:18-cv-03016 KJM GGH P

<u>FINDINGS AND RECOMMENDATIONS</u>

*Introduction and Summary*

       Perhaps the most difficult claim in federal habeas is an assertion that a petitioner received ineffective assistance of counsel regarding strategic decisions. Not only are such decisions almost unassailable, but even what might be a favorable *de novo* decision in this area is further filtered through AEDPA deference—here, the ineffective assistance determination of the California Court of Appeal after evidentiary hearing on the ineffective assistance issues in the state trial court. However, petitioner does not claim ineffectiveness of counsel here simply on the choice of a defense strategy chosen by trial counsel; rather the "wrong" or "incomplete" defense was chosen because of an alleged lack of investigation. The overall mistrial verdict in the first trial "demonstrates" that counsel should have investigated and utilized a "peer contamination"

defense in the second trial. Claiming that an alternative to the defense strategy chosen is the one which should have been employed is also particularly difficult from the prejudice standpoint—how does one really show a probable, different outcome on an argument that the unchosen defense would probably have changed the outcome, or was so much better, that "confidence in the outcome [in the second trial] is undermined." Petitioner's counsel argues that finding prejudice is easy here because the unchosen defense in the second trial was the one which "worked" in the first trial; at least it led to a mistrial.

Respondent rejoins that the charging circumstances were different in the second trial; hence one should not fault the defense counsel's strategy in the second trial, and finding prejudice is the proverbial equivalent of comparing apples and oranges.

After thorough review of the well written submissions by both sides, the undersigned recommends the petition be denied.

*Procedural Background*

> After a jury was unable to reach a verdict on any of the charges of child molestation of five victims, the People filed a second amended complaint against defendant Shane Adair Vicars. The second amended complaint charged defendant with committing 13 counts of lewd and lascivious acts on a child under the age of 14 against two victims, D. and J. (Pen. Code, § 288, subd. (a).)1 The second trial culminated with defendant's conviction on all 13 counts. The trial court sentenced defendant to serve 26 years in state prison and imposed various fines and fees.

People v. Vicars, No. C075022, 2017 WL 5712592, at *1 (Cal. Ct. App. Nov. 28, 2017) (cited hereafter as Vicars).[1]

In his first trial, petitioner was represented by Shannon Baker. However, petitioner's (and his family's) finances had fell on hard times on account of the first trial, and he could not continue with Baker. Petitioner retained Michael Chastaine for the second trial on a "flat fee" basis, i.e., Chastaine received a particular amount no matter how short or long it took to represent petitioner in the second trial. The ins and outs of the conflicting strategies utilized by the two

---

[1] The record in this case is conflicting as to whether there were five or four children at issue in the first trial who were dropped for the second trial. However, nothing in the outcome of this habeas depends on the precise number of dropped children.

counsel are set forth at length herein but suffice it to say that the strategies involved were quite different in important respects.

After conviction in the second trial, petitioner fired Chastaine, and re-hired Baker for purposes of a motion for new trial.  Petitioner received an evidentiary hearing in the state trial court on the motion for new trial concerning ineffective assistance of counsel (Chastaine).  Petitioner's motion for new trial was denied.  He then filed an appeal raising numerous ineffective assistance grounds, and this appeal was denied on November 28, 2017.  The petition for review before the California Supreme Court was denied on March 14, 2018.

Without further exhaustion in the state courts, petitioner filed this federal petition through counsel on November 20, 2018.

*Issue Presented*

Petitioner makes one overarching issue:  Counsel at Petitioner's Retrial Rendered Ineffective Assistance Under [The Sixth] Amendment By Selecting a Defense That Required Little Preparation And Failing to Review The Material and Transcripts from the Original Trial That Would Have Allowed Him to Present the Stronger Defense.  ECF No. 1 at 6.

The omitted defense in this child molestation retrial centered around a "peer contamination" theory, i.e., the two children at issue in the retrial had their memories of the events influenced, even created by, rumors of petitioner's sexual misconduct spread by their schoolmate peers.  This defense is asserted to be one which would have required nearly complete review of the pretrial transcripts, and a presentation in some form of the retributive accusations of some molested victims at retrial who were not formally part of the retrial charges but had been at the first trial. The defense at retrial actually employed was termed "false memory," i.e., the children's memories of the alleged molestations were falsely created by outside parental or authority figure suggestions, elapsed time, and a desire to conform their memories to "what they had heard."  However as noted above, this defense expressly rejected basing the false memory defense on the accusations of the children's-at-issue peers—the alleged molest victims in the first

////

////

3

case not expressly part of the charging document counts in the retrial.[2]

Petitioner argues that the decision not to introduce evidence concerning rumor creation by the non-charged molested victims was born of counsel's desire to save time, and hence preserve the economic viability of his "flat fee" arrangement. Alternatively, respondent and trial counsel posited the dangers in introducing more molestation incidents to the jury.

At the end of the Points and Authorities, petitioner raises "Trial counsel's other mistakes at retrial." These mistakes include the failure to impeach the "charged children's"[3] association with each other, a failure to object to prosecutorial misconduct in closing argument, and a failure to challenge a jury instruction. It was unclear whether these additional accusations of ineffectiveness were supposed to stand on their own, or were added merely as "ineffectiveness flavor" designed to buttress the overarching charge. At hearing, counsel for petitioner indicated that these issues were additive to the main issue. The undersigned will address these sub-issues as they impact the main issue of failure to investigate.

*Factual Background*

The facts pertinent to the issue in this case are taken from the opinion of the Third District Court of Appeal:

> At the time of the second trial, D. was 11 years old. D. testified he had attended kindergarten at an elementary school where he received before and after school care at a club. Unless D.'s family traveled for vacation, D. attended the club. Defendant was D.'s teacher at the club. Defendant was assisted by two other teachers: S. and R. Defendant played with students during recess and during club time before and after school. D. liked the club—especially after school when they played games and had free time. Defendant also attended one of D.'s birthday parties and some of his sports events. Defendant

---

[2] The peer contamination theory appears to be simply a sub-species of the more ominous "false memory" defense. That is, false memories are created, for example, by suggestions from parents, authority figures or peer contamination. The undersigned understands that petitioner contends that trial counsel in the second action should have presented a false memory defense based upon the asserted fictional, retributive creations of the children omitted as charged victims in the second case.

[3] Of course, by use of this shorthand, the undersigned does not indicate that the children were "charged" in this case; rather it is a shorthand for the longer phrase-- the children pertinent to the sexual misconduct charges brought against petitioner, i.e., victims, as it turned out by reason of the jury verdict. The use of this shorthand differentiates this second trial from the first on account of the lesser number of children at issue in the second trial. The dropped victims will be termed "uncharged children."

4

was the only adult who attended D.'s seventh birthday party. D. and the other students at the club thought defendant was fun and liked to be around him.

1. The first-time defendant rubbed his hand on victim D.'s stomach while in the office.

Starting when D. was in kindergarten, defendant would announce several times each week that it was time for the students to go outside and play. Then defendant would walk up to D. and tell D. to "stay in with him to help get [defendant's] wallet out." As the students went outside with S. and R. to play, defendant and D. would go into the club office together. Defendant would close the door that had its window covered by newspaper. Defendant would sit down on a chair and would have D. stand in front of him. Defendant would put his hand underneath D.'s shirt and rub D.'s stomach. The first time this occurred, D. asked why defendant was doing so and defendant responded "that he needed to get his hands warm." D. remembered defendant's hands being wet and cold.

2. The first time D. put his hand on defendant's penis on top of defendant's clothing while in the office.

After defendant rubbed D.'s stomach, defendant announced "that now it's time for my wallet." Defendant "said that he needed help. He needed [D.] to help him get his wallet out of his pocket." D. tried to get defendant's wallet from his pants pocket by shaking the pants. D. shook the pants for a minute or two.

3. The first time D. put his hand on defendant's penis underneath defendant's clothing while in the office.

After the wallet did not fall out, defendant pulled up his pants up to his knees and told D. "to shake it from the inside." Defendant "pulled his pants up and [D.] would stick [his] arm in and shake from the inside." Defendant would "kind of like shake [D.'s] hand" while D. was shaking the wallet inside defendant's pants. This occurred while defendant was sitting and D. was kneeling in front of him. D.'s hand "was very close to [defendant's] privates." D. held on to something that "felt like a leather wallet, but it was kind of sticky." D. testified, "[W]hat I remember is ... once in a while, I would take my hand out of his pant leg and like have to dry off a little from the stickiness, and then I would put it back in."

D. knew he could stop shaking when the wallet would fall out and to the ground. Defendant would then ask D., "what do you want?" D. would then have a choice between a piece of candy, a toy soldier, or "some money in the game" the students would play and that would help D.'s team win.

4. A subsequent time when defendant rubbed his hand on D.'s stomach while in the office.

D. testified this sequence of events involving "shake the wallet" occurred 20 to 30 times. Defendant would always rub D.'s

5

stomach—usually before the shaking, but a few times after the shaking. D. recalled another occasion that occurred inside the club office after D. had asked to get a game out of the office. Defendant put his hand underneath D.'s shirt and rubbed his stomach.

5. A subsequent time when D. put his hand on defendant's penis on top of his clothing while in the office.

On the occasion when D. had asked for the game from the office, defendant stopped rubbing D.'s stomach and told D. to "get his wallet out." D. testified that "every single time I'd first rub it from the outside, every time. I would never start rubbing it from the inside."

6. A subsequent time when D. put his hand on defendant's penis underneath defendant's clothing while in the office.

As always, after a minute or two of D's shaking the wallet from the outside of defendant's pants, defendant instructed D. to shake by reaching into defendant's pants. And, as always, the wallet would fall out at the end. D. would then need to dry off his hands.

7. The first time D. put his hand on defendant's penis on top of defendant's clothing while outside the building.

Defendant also initiated the shaking sequence with D. on six or seven occasions while outside the club building. Count 7 pertained to the first time D. put his hand on defendant's penis on top of defendant's clothing while they were outside the club building. Defendant rubbed D.'s stomach. Then D. rubbed defendant's wallet on the outside of defendant's pants.

8. The first time D. put his hand on defendant's penis underneath defendant's clothing while outside the building.

On the occasion of the first molestation to occur outside the club building, defendant also had D. put his hand inside defendant's pants to look for the wallet.

9. The last time D. put his hand on defendant's penis on top of defendant's clothing while outside the building.

On the last occasion when the molestation occurred outside the club building, D. was in second grade. Defendant and D. were outside the building while the other children were all inside. Defendant recruited D. to look for stray playground balls. Defendant was wearing jeans. Defendant said he got his wallet stuck and D. helped him shake his wallet in the same way as on all the previous occasions. D. shook the wallet from outside defendant's clothing.

10. The last time D. put his hand on defendant's penis underneath defendant's clothing while outside the building.

On that last occasion, D. also shook the wallet from inside defendant's pants for about a minute. Defendant's wallet felt slimy. The wallet fell out and D. was rewarded with "the gold or soldier."

After they went inside, defendant told D. not to tell any of the other children " 'cause it wouldn't be fair.' " Defendant stopped asking D. to help find his wallet when D. was in second grade.

Additional Evidence of Defendant's Molestations of D.

Sacramento County Sheriff's Department Detective John Linke investigated the child molestation allegations against defendant. As part of Detective Linke's investigation, he interviewed R. and S. about what they observed in connection with defendant. R. told the detective she was concerned because "on many occasions [defendant] was not on the playground ...." She observed that defendant "left the playground unannounced approximately three to four times a week." R. confronted defendant on one occasion. Although defendant apologized, his practice continued. R. told Detective Linke "that one of the boys in particular that she had seen [defendant] leave with or come back with was D[.]"

Defendant's other teaching assistant, S., indicated to Detective Linke that defendant was "particularly close" to D. S. further indicated that "it was not at all uncommon for [defendant] to leave the playground and take a kid back to the club alone." S. observed this to occur "several times a week." Ordinarily, this did not cause concern for S. However, one occasion did "raise a red flag" for her when "she walked in and saw [defendant] alone in [the club] with D." This observation gave S. a weird or strange feeling.

1.   The first-time victim J. put his hand on defendant's groin area.

At the time of the second trial, J. was 10 years old. J. testified he had attended an elementary school from kindergarten through third grade. During that time, J. participated in the club programs several days a week after school. When school was not in session, J. would sometimes spend the entire day at the club. J. remembered defendant being his teacher at the club. J. liked defendant, thinking he was "[p]retty cool and fun."

J. testified he had been trying to forget incidents with defendant and his recollection was better during an earlier Sexual Assault Forensic Evaluation (SAFE) interview.

During J.'s SAFE interview, he stated there were six occasions when defendant had J. get defendant's wallet out. Defendant would have J. wiggle defendant's wallet until it fell out. J. believed the process involved touching defendant's penis because the wallet and defendant's penis were next to each other.

Count 11 related to the first-time defendant had J. touch defendant's groin area. During his SAFE interview, J. explained he was in kindergarten the first-time defendant had him put his hand into his pants pocket to get out defendant's wallet.

On that first occasion, J. had to use the bathroom and defendant allowed him to use the bathroom that required going through the teacher's lounge. When J. finished with the bathroom, defendant was

waiting for him in the teacher's lounge. Defendant rubbed J.'s stomach. Defendant made J. get the wallet out of defendant's pants pocket.

> 2. The second time J. put his hand on defendant's groin area.

During the SAFE interview, J. explained defendant made him shake the wallet three times—twice in kindergarten and once in first grade. Count 12 related to the second time when J. was in kindergarten that defendant had J. put his hand on defendant's groin area. As on the other occasions, J. would go to the bathroom and defendant would allow J. to use the bathroom adjacent to the teacher's lounge. When J. returned, defendant had J. retrieve defendant's wallet from his pants pocket while defendant was sitting in a chair in the teachers' lounge. Defendant then had J. shake the wallet from outside defendant's pants. To J., it felt both "kind of hard and kind of squishy."

> 3. The third time J. put his hand on defendant's groin area.

Count 13 charged the third time J. put his hand on defendant's groin area. J. was in first grade for this count. As usual, defendant was sitting in a chair in the teacher's lounge. Defendant made J. shake the wallet out of his pants pocket. To J., defendant's wallet felt like defendant's penis. At the end, the wallet would usually fall out and defendant would tell him, "Thanks, J."

Vicars, at *2-4.

The defense case was not lengthy. It consisted of one witness, Dr. O'Donohue, who testified generally about the creation of false memories; there were no specifics given from the record concerning the potential for a technique/question to give rise to false memory. Indeed, the expert did not even relate what in the record he had reviewed. This testimony took about half a day of the trial.[4] See ECF No. 14-14 at 181-253 (including cross-examination). The expert did make some general allusions to examples which might have been applicable to the case, but he did not specifically relate the examples to the case.

---

[4] Counsel for petitioner initially stated during motions in limine that this expert, although rendering no ultimate opinion on whether a child had "false memory," would rely upon certain specifics from the case to point out potential for the creation of false memory. ECF No. 14-13 at 50, 52, 66. However, counsel was seemingly limited by the judge to have his expert simply generally discuss the theory of false memory: "His proposed testimony regarding proper interviewing techniques, addressing the concern that the child's testimony can be contaminated through the interview process; he can testify about suggestability by young children; however, he cannot point out inconsistencies in the children's statements because, as I indicated in my ruling, I don't think that's expert testimony." Id. at 101. See also ECF No. 14-6 at 105.

In fairness, a part of the defense case was the cross-examination of the two boys. This cross-examination brought out some inconsistencies between the SAFE interviews taken before the first trial, and a video made by D's father prior to the SAFE interview, and the testimony in the second trial.

With respect to child D (ECF No. 14-13 at 210-234), the cross-examination primarily focused on the video that D's father made regarding the alleged molestation incidents, especially where D had been told that petitioner "had broken the law." See, e.g., ECF 14-13 at 215. D was also questioned regarding his prior statements that the molestations (wallet game) occurred about five times, and his present testimony regarding 20-30 times (Id. at 214)[5]; his confusion as to which pocket the wallet was located; possible inconsistency about the shape of the wallet; the problematic fact that some molestations occurred in an indoor closet while all the other children were in the classroom; and various other possible inconsistencies.

J's cross-examination was relatively short. ECF No. 14-14 at 4-13. Curiously, like D, J had stated in an earlier interview that the molestations occurred 6 times, but testified at trial 20-30 was the correct number. J ultimately testified that he did not know how many times it happened, and that he was making a "guess." Id. at 7.[6] Also, J was questioned on the fact that he had

---

[5] So there you heard yourself say when you were asked how many times he has done this you said five, right?
THE WITNESS: Yes.
Q. Okay. You said here that it was 20 or 30 times. Why the big difference?
A. I don't know. In other videos that I saw that I had, at that time, I also said around 20.
Q. Okay. So you have watched other videos besides this?
A. Yes.
Q. When you were being questioned by your father there and your mother, why would you tell them it was only five?
A. As I said before, I remember at that time I didn't really want Shane to get in trouble.

[6] Okay. Now, where we just ended it you said it happened six times?
A. Yes.
Q. And you have told us today that it happened 20 to 30 times rubbing your tummy and 20 or 30 times playing the wallet?
A. Yes, but I was seven during that time and it still went on for I think I was late seven, kind of well, mid seven when it ended.
Q. When you were interviewed here, Shane had already been arrested, hadn't he?
A. Yes.
Q. And you never saw him again?
A. I don't remember. It could have been. [footnote continued]

9

previously related that a cell phone was involved and not a wallet.  Id. at 9.  Counsel also focused

upon the fact that J had been told before interviewing that petitioner was in jail for the things he

had done, and he would never teach again.  See id. at 8, 10.  The cross-examination of J ended

shortly after it began, and it appeared that J would be called for further testimony, but that never

happened for unexplained reasons.  See id. at 11, 12, 13.

*Factual and Legal Findings of the State Courts*

    1.  <u>Motion for New Trial/Evidentiary Hearing</u>

      As referenced above, after the guilty verdicts in the second trial, petitioner's second trial

counsel was replaced by trial counsel who had represented petitioner in the first trial (Shannon

Baker).  She brought a motion for new trial based on second counsel's ineffectiveness.  The

motion was quite comprehensive.  See ECF No. 14-7 at 110 et seq. (The filings cover several

volumes of the CT)  In support, Baker filed, inter alia, the first trial transcripts of the children, the

charges for whom had been dropped by the prosecutor in the second trial.  At least one statement

was filed from an aide at the school where petitioner worked which cast doubt on the logistical

ability of petitioner to molest the children.  An exhibit was filed showing the relative infrequent

times J had attended the "Discovery Club," with an assertion that J was not present at the times

---

Well, let's play a little bit more because I think this will help.

(Video being played.)

BY MR. CHASTAINE: Okay, so there you are saying he is already in jail?

A. Yes.

Q. So after this interview you had not seen Shane again?

A. Yes.

Q. Is that correct?

A. Yes.

Q. All right. So I am going to go back to my question. You told Kim initially six times and now you are saying to us 20 to 30 times rubbing your tummy and 20 to 30 times with the wallet?

A. Twenty to 30 times at all.

Q. Why was it six times there and here in this courtroom it is 20 to 30 times?

A. Well, adding them all up, just restating the question.

Q. Okay. What are you adding up?

A. The time of the tummy and the time of the pocket.

Q. Okay. So when --

A. Because I could have just been mistaken since that was three and-a-half years ago.

Q. So when were you mistaken, then or now?

A. I really don't know.

alleged for the molestations.  A declaration from a lawyer expert, Quin Denvir, was also submitted who opined, in part, that reasonable counsel would have reviewed all the available transcripts (including those which could have been transcribed) and material from the first trial. Neither the motion nor the expert's declaration opined that the prejudice standard for ineffective assistance claims were met; the subject was not discussed.

The opposition countered each point set forth in the motion for new trial.

The trial judge (Hon. Emily Vasquez) held an evidentiary hearing on the motion for new trial.  Quin Denvir was the first witness called.  He had only reviewed the motion and a few declarations; he did not review the exhibits attached to the motion.  His testimony focused upon the non-attempt by trial counsel to demonstrate a connection between the two children, J and D, and the likelihood that they had associated to some degree "got their stories straight."  Denvir also opined that the asserted failure to bring into evidence the "rumors" of petitioner's misconduct; again, this evidence would have tended to substantiate the basis for petitioner's false memory defense and/or the fact that the entire misconduct had been fabricated by other children who had a bias against petitioner and then circulated as the facts of the case.  Finally, a possibly defective jury instruction, which is not a direct claim at issue in this petition, was discussed.  On cross-examination, the deputy district attorney stressed that to the extent the other children had been discussed at trial, she would have then been free to develop the facts that these children had testified (in the first trial) that they were abused by petitioner as well.  Some other matters were discussed such as the "failure" of trial counsel to bring into evidence that the parents (who inferentially coached their children) had a financial interest in the outcome of the criminal case due to pending civil lawsuits.

Trial attorney in the second case (Chastaine) then testified.  Although he had filed a barebones declaration on behalf of petitioner, succinctly stating only what he had not investigated), he was called by the deputy district attorney.  Trial counsel was defensive (not in a bad sense) on what he had not done or done, and why those actions had been performed.  Counsel developed that he had quite a bit of experience handling sexual crimes defense.  He charged petitioner (and his family) a "flat rate" for taking the case—expert expenses were additional.

Counsel related that he had spoken to Ms. Baker, and other attorneys with respect to general questions or issues. Importantly, counsel related that he had thought quite a bit of whether to bring into evidence the non-charged children's rumor creation/dissemination at risk of exposing the jury to testimony that these children had been abused as well with the "wallet game." In finally deciding to go with the "slimmed down" version of the defense as outline previously (a difficult decision), he thought there was enough impeachment material of the children involved in the criminal charges for the second trial, and that the risks of having additional children testify had too great a tendency to poison the jury. He did not, however, prior to making his strategy decision, do any substantial investigation of the record of the first trial (aside from the testimony of the children pertinent to the second trial charges), including obtaining/reviewing transcripts of the children who had testified in the larger first trial. The record from the first trial comprised approximately 17,000 to 18,000 pages. He thought about introducing evidence of the potential financial bias of the parents of the charged children but thought the settlement of that case against the school overly complicated the matter. With respect to calling other teacher personnel to show that it would have been difficult for petitioner to have the opportunity to perform the molestations, counsel testified that he did not call these personnel because the "lack-of-opportunity" strategy was not what his defense focused upon. Counsel believed that he did not have sufficient information on the charged children's association to attempt bring that out as a possible basis for the false memory defense. Finally, counsel thought that he had "dropped the ball" in not objecting to the jury instruction which could have made it appear that the jury did not have to be unanimous for each of the separate charges—just that petitioner had been found to have performed one of the acts pertinent to the charges.

Because the factual findings of the trial judge are critical in an AEDPA analysis, the undersigned sets forth here the entirety of the trial judge's ruling:

> All right. Essentially the defendant asserts seven claims in his motion for new trial, mostly involving ineffective assistance of counsel. And there is one claim pertaining to a jury instruction that I gave, which both counsel did not object to, CalCRIM 3500 as modified.
>
> To show constitutionally inadequate assistance of counsel, a defendant must show that counsel's representation fell below an

12

objective standard and that counsel's failure was prejudicial to the defendant. In Re Alvernaz, 1992, 2 Cal.4th 924, and the jump cite is 937.

It is not a court's duty to second-guess trial counsel, and great deference is given to trial counsel's tactical decisions. In Re Avena, 1996, 12 Cal.4th 694. The jump cite is 722.

Actual prejudice must be shown, meaning that there is a reasonable probability that but for the attorney's error the result would have been different. Strickland versus Washington, 1984, 466 U.S. 668, and the jump cite is 694.

I intend to discuss each of the claims made by the defendant in his motion for a new trial. First, the defendant asserts that Mr. Chastaine failed to review transcripts from the first trial.

Defense counsel acknowledges that he did not review the transcripts of many witnesses from the first trial. However, the court notes that Mr. Chastaine was not denied access to the transcripts. Instead, it appears that Mr. Chastaine chose not to review them in light of the significantly reduced number of charges. And indeed, Mr. Chastaine testified that he did not make the decision on this issue until the prosecutor had dismissed those additional charges. It was at that time that he then made the decision that it wasn't necessary for him to read those additional transcripts.

Mr. Chastaine testified that he spoke to Miss Baker about the other witnesses, he had her notes with respect to all of the other witnesses, he'd read the police reports, reviewed the SAFE interviews, read the depositions and interrogatories and all the pleadings in the civil case, and all of this factored into his decision in not requesting all of the transcripts.

He testified that he had a strategy; he had a defense.

He also testified that if the charges had not been dismissed by the prosecutor, he would have gotten the other transcripts.

Defendant further claims that there could be no tactical reason for failing to review those transcripts. But the court finds that this is a mere assertion, given Mr. Chastaine's testimony. The defendant suggests that reasonable counsel would have reviewed the transcripts based on the declaration of Mr. Quin Denvir and based on the testimony of Mr. Quin Denvir.

There is no doubt that Mr. Quin Denvir is in a league of his own. He's highly learned, highly respected attorney, not only in this state but throughout the nation. But Mr. Denvir himself testified that he did not review all -- he did not review the transcripts. He did not review all of the documents in this case. He did not review the interrogatories. He did not review the police reports. He did not see the SAFE interviews, observe or review the SAFE interviews, the interrogatories.

He only reviewed, he testified, the pleadings and the motion for a new trial -- the original motion. He didn't review the exhibits to the motion for new trial except a couple of declarations. And he also reviewed the district attorney's response and the defendant's reply brief. He testified he did not read the police reports, did not read any of the other items that I just listed.

In addition, the defendant suggests that no showing of prejudice is required for this particular claim. But this is a misstatement of the law. A claim of ineffective assistance of counsel must always be accompanied by a showing of prejudice, which was not done in this case with respect to this claim. Two, the defendant asserts that Mr. Chastaine failed to present testimony from Miss Enry, Miss Albright, or Mr. Loftman. The defendant claims that the testimony from these potential witnesses would have shown that defendant did not have the opportunity to commit the offenses.

Now first, the People argue that the two Discovery Club employees who did testify were not particularly helpful to the defendant. Based on my observation of the two Discovery Club employees who testified, I concur in that assessment. Indeed, the defendant's own summary of their testimony shows how little defense they offered.

Rajitha Bandara testified it would not have been strange for defendant and a student to get equipment for games and meet everyone else outside, suggesting that the defendant and the students stayed behind, which is the scenario in which Donesh described how some of the molestation occurred.

Similarly, Miss Bandara testified that the defendant occasionally left the playground with students and previously told a detective that it happened several times a week. She was impeached with that prior statement.

She also testified that students were allowed to use the restroom in the teacher's lounge on non-school days, which is where Jackson testified that the molestations occurred, which took place mostly during non-school days.

Similarly, Miss Shelley Mors testified that the molestations occurred -- which did occur that the -- testified that the defendant usually was leading the way out, but did not say that defendant never stayed back when the kids went out.

Miss Mors further stated that she did not see defendant go into the office with Donesh, but did not and likely could not say that it never happened. Given this lack of useful testimony, it was not unreasonable for trial counsel to determine that additional Discovery Club staff would not be useful witnesses, particularly since it seemed like there was not a steady, regular staff member that was there every day that Mr. Vicars was there.

Mr. Chastaine did testify that he did not follow up with respect to emails that he received from Miss Baker to contact Miss Susie Albright and Mr. Tim Loffman. But even if counsel's omissions were

unreasonable, defendant has just not shown prejudice. It is not reasonably likely that the result would have been different, because the statements do not show that the defendant did not ever have the opportunity to commit the offenses. Indeed, Miss Alicia Enry's statement included her belief that defendant used the outdoor shed near the playing field, which is where some of the charged offenses involving Donesh took place.

She also said that there were times when children used the restroom in the teacher's lounge which is where the offenses involving Jackson occurred. The fact that Miss Enry might have testified that she never saw defendant act inappropriately with students does not show that he never had the opportunity to do so. And indeed, Mr. Chastaine said that he considered the statement of Miss Enry that was provided to him -- and it was one of the attachments to the motion for new trial -- and his determination was that Miss Enry was not helpful to his defense. Given the harmful aspects of Miss Enry's statement, counsel's failure to call her to testify was not prejudicial.

Likewise, Susie Albright's statement that she never saw defendant take Donesh or Jackson anywhere alone does not show that he did not ever have the opportunity to do so. She further stated that she did not recall whether defendant ever stayed behind with a student when most of the other students left or played outside.

Finally, Mr. Loffman only worked at Discovery Club for a short time; nevertheless, he did recall defendant holding Danesh in the classroom while everyone else went outside for disciplinary reasons. Holding him back in the classroom while everyone went outside for disciplinary reasons. This lasted only about five minutes. The remainder of Mr. Loffman's statement is rather vague and essentially consists of a character reference for Mr. Vicars, but does not show that the defendant did not have an opportunity to commit the crimes.

Defendant also claims that trial counsel should have introduced evidence of Jackson's attendance at Discovery Club to impeach his testimony. It is true that Jackson testified that he went to Discovery Club more on non-school days than after school, and the attendance records do appear the (sic) contradict his testimony. Regarding impeachment, first it must be considered that Jackson was ten years old, testifying about his attendance four to five years earlier when he was five to six years old.

Second, it does not appear that he testified that the molestations only occurred during non-school days. He testified that he could not remember. Finally, even if the molestations occurred only on non-school days, because it happened during dodge sock which took too long to be played after school, the three charged incidences which were -- which pertain to Jackson could have happened during those nine non-school days that Jackson attended Discovery Club. Therefore, the defendant has not shown that counsel's failure to introduce the attendance records was either unreasonable or prejudicial.

////

Three, the defendant asserts that Mr. Chastaine failed to present evidence of rumors circulating at the school. Although defendant states that there could not have been a tactical reason for trial counsel not to present this evidence, Mr. Chastaine testified that the tactical reason was that more evidence of rumors of who would have -- excuse me. More evidence of rumors would have been prejudicial to defendant's case because it would have necessitated presenting the testimony of other students, including possibly the uncharged victims.

Mr. Chastaine stated that he considered this -- or evaluated this as a reverse 1108 motion, that if the prosecutor had brought in these additional witnesses, he would have moved to exclude them pursuant to Evidence Code section 1108, and he considered this a reverse 1108 motion on his part. That's how he analyzed it, is what his testimony was. Further, he testified last week that the testimony -- excuse me. Strike that.

Further, according to the defendant's motion for new trial, the rumors being spread were that the defendant had rubbed children's stomachs and asked them to find his wallet. Even if that evidence had been introduced, it would still not explain the testimony provided by Donesh and Jackson, their descriptions of the act of molestation which entailed shaking of the wallet and the defendant sitting on the chair.

Finally, there was also evidence that defendant had once openly asked students whether they could find his lost wallet, which Mr. Chastaine did argue was one of the sources of the alleged fabrication. He argued this in his closing argument. He specifically said "and that has morphed itself into the nightmare that he finds himself today."

Four, the defendant asserts that Mr. Chastaine failed to exploit the relationship between Donesh and Jackson. The defendant claims that Donesh and Jackson were friends as evidenced by Donesh's testimony at the first trial, but that during the second trial Jackson denied that they ever talked, played together, or went to each other's birthday parties, which constituted false evidence by the prosecutor in her closing argument. Defendant claims that there could have been no tactical reason for failing to elicit the connection between the boys.

First, impeaching Jackson could have been risky and seen as attacking a small child victim. Second, there is little evidence that they knew each other before they made their allegations. In other words, whether they had an opportunity to jointly discuss their accusations. The questions about Donesh's interactions with Jackson were not given a time frame. So it is entirely possible that those interactions occurred after the molestations. In other words, in the intervening years between the conduct and the trial. While it appears they went to preschool together, they were in different grades.

Finally, whether they were friends or played together is somewhat subjective. Jackson could reasonably believe and testify that he was not friends with Donesh or played together, and at the same time

Donesh could reasonably believe and testify that they did so because they both attended Discovery Club at the same time.

Mr. Chastaine testified last week that he did not have any direct evidence that these two boys had specifically spoken about the issue in this case to each other. In his closing argument he did argue to the jurors that they both were at Discovery Club -- at Discovery Club at the same time, even though they were two grades apart.

Mr. Chastaine also testified that he had reviewed the SAFE interviews and that the SAFE interviews impeached the trial testimony of Jackson and Donesh and indeed he argued this in his closing argument, and the SAFE interviews were admitted into evidence in the trial that was before me. And Mr. Chastaine argued that.

Number five, failure to present evidence of victim's father's financial interest. As stated in the People's brief, the likely tactical reason for trial counsel not to elicit this information was that it would have opened the door to the circumstances surrounding the civil litigation, including the other victims that were a part of the litigation and settlement.

And the court notes that this would have been prejudicial to defendant's case. Indeed, Judge Savage had ruled that the parents could explain that they were not biased, this information was coming in for -- or the defense made a motion to present this evidence to show that the parents were biased in this case, and Judge Savage agreed -- or allowed the prosecution then to present evidence as to how they were not biased and to discuss the basis for that civil litigation.

Mr. Chastaine testified that he was aware of Judge Savage's ruling and that he believed that Judge Savage's decision was sound. Mr. Chastaine testified that he made a tactical decision that it was not in the defendant's best interests to go that route, that he had a defense, and he wanted to pursue the defense that he had, which was false memory on the part of the two young boys.

Number six, the defendant asserts that Mr. Chastaine failed to call Jackson's mother. The defendant claims that counsel should have called Mrs. Wohl to testify about Jackson's disclosure to impeach Mr. Wohl's testimony that he questioned Jackson instead of Mrs. Wohl and to show that she was aware of the nature of the wallet game and asked him whether he had played it with the defendant.

Mr. Chastaine testified last week that the identity of the person who asked the questions of Jackson was not particularly relevant. In both circumstances the parents stated that he or she was aware of some allegation that defendant had inappropriately touched children using the ruse of the wallet game and asked Jackson if he had ever played the game with the defendant.

To the extent that defendant argues that Mrs. Wohl could have planted the idea that shaking was involved in the game, there is no

17

evidence that she ever suggested that the game involved Jackson putting his hand inside defendant's pants pocket to get the wallet out.

Finally, as indicated by the opposition, defense counsel at the first trial had the same information and elected not to call Mrs. Wohl, suggesting that it was a tactical decision. And as a matter of public record, the court notes indeed

Mrs. Wohl was not called as a witness in the first trial.

Claim number seven. Unanimity instruction. The court excuse me. And then also Mr. Chastaine testified last week that he did review the deposition of Mrs. Wohl. He reviewed actually all of the depositions, interrogatories pertaining to that civil case, and he determined that Mrs. Wohl added nothing that was useful. She, in quotation marks, she could not help our case, is what he stated last week when he testified here in court.

Claim number seven, the unanimity instruction. The court gave a modified version of CalCRIM 3500 because this case involved more than one charge. It involved 13 charges. Defendant argues that because the unanimity instruction did not state that the jury had to come to a unanimous decision for, in quotation marks, for each offense, that the instruction could be read so that if the jurors each agreed that defendant committed at least one of the offenses and agreed on that act, they could convict him of all 13 offenses.

The court does note that I gave CalCRIM 3515 immediately after giving CalCRIM 3500, which states that each of the counts charged in this case is a separate crime. You must consider each cr:une -- excuse me. You must consider each count separately and return a separate verdict for each one.

The court also gave CalCRIM jury instruction 3550, which instructed the jurors in pertinent part that you will be given verdict forms. As soon as all jurors have agreed on a verdict, the foreperson must date and sign the appropriate verdict form and notify the bailiff. If you are able to reach a unanimous decision on only one or only some of the charges, fill in those verdict forms only and notify the bailiff. Return any unsigned verdict forms. And the court also read CalCRIM 3517 to the jurors. This deals with how to complete the verdict forms when there are lesser-included offenses. The court determined that counts one and four had a lesser-included offense of battery. I won't read the entire instruction, but parts of it state that, quotation marks, if all of you agree that the People have proved the charge beyond a reasonable doubt, dot-dot-dot, or quotation marks, if all of you agree that the People have not proved the charge beyond a reasonable doubt -- or if all of you cannot agree whether the People have proved beyond a reasonable doubt to notify the court of the inability to reach agreement.

And the court also read the -- I'm just picking out a few Jury instructions that I read to the jurors. Certainly the packet was rather thick. The packet included 38 pages of jury instructions.

I also read CalCRIM 1191 to the jurors. This jury instruction concerns evidence of the defendant's commission of another sexual offense. And part of the instruction reads as follows if you conclude that the People have proved beyond a reasonable doubt that the defendant committed a charged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of additional charged offenses. The People must still prove each element of every charge beyond a reasonable doubt.

And I also read to the jurors CalCRIM 200, which states that -- and instructs the jurors to consider all of these jury instructions together.

In order for the Jury to read this instruction as defendant argues, the jury would need to ignore all of the other jury instructions, including the court's instructions during voir dire.

From the very first day the jury was informed that the People must prove each element of every charge beyond a reasonable doubt. The court read the information wherein the prosecutor made an election for each count as to the specific facts alleged with respect to each charge. And the specific facts were different for each charge, although each charge did allege a violation of Penal Code section 288a.

The verdict forms which were provided to the jurors also tracked the specificity that was set forth in the information as to the victim and the specific act alleged with respect to each charge. And the specific act was different for every single charge.

In this case for each charge the prosecution elected the specific act relied upon to prove that specific charge to the jury. And this specific act elected by the prosecutor was clearly set forth in the information and it was read to the jurors by the court on at least two occasions. The prosecutor in her closing argument informed the jury of her election of the specific act for each charge and that she had to prove each charge beyond a reasonable doubt.

Further, I just want to state that the court determined that it need not give CalCRIM 3501 because that instruction was just not appropriate in this case. It was not appropriate based on the facts of this case. And indeed, my reading of CalCRIM 3501 is that it gives the jury actually an easier way to arrive at unanimity. Reading all of the instructions together, no reasonable jury could have interpreted this instruction to require only that the jury agree on one act to convict defendant of all 13 counts. Especially since each of the acts was identified in the separate counts and there were two victims. See People v. Brock, 2006, 143 Cal.App.4th 1266, 1277, where the court stated, quotation marks, jury instructions must be read together and understood in context as presented to the jury. Jurors are presumed to be intelligent persons capable of understanding and correlating jury instructions. An erroneous instruction requires reversal only when it appear the error was likely to have misled the jury, end of quotation marks, citations omitted.

The court notes that three very experienced counsel, including Miss Baker in the first trial before Judge Savage, did not object to this instruction as modified. To me, this jury instruction properly informed the jurors. However, assuming arguendo that there was error, the court finds that under these circumstances the error in the jury instructions was harmless beyond a reasonable doubt.

In sum, the defendant has not shown that there was no tactical reason to explain trial counsel's actions at trial. In addition, defendant has failed to show that trial counsel's acts or omissions resulted in prejudice. Defendant has failed to show that he is entitled to a new trial. And for all of these reasons, the court denies the motion for new trial.

ECF No. 14-15 at 232 (to end); 14-16 at 1-13.

An appeal was taken. Again, at the risk of making these Findings and Recommendations very lengthy, it is important to set forth the entire reasoning of the Court of Appeal, at least with respect to the overarching issue:

During the first trial, defendant's trial attorney cross-examined J. about rumors that were spreading among the club's students. J. testified that "the kids" were saying defendant "was getting fired" because "what he would do to kids, like rubbing their tummy and trying to find ... his wallet." According to J. the source of these rumors might have been M., one of the victims of offenses charged only in the first trial (uncharged victims). J. also thought the source might have been L., another uncharged victim.

During the second trial, the prosecutor did not charge any crimes involving M. or L. Neither did the prosecutor call M. or L. as witnesses during the second trial. Likewise, the defense also elected not to call M. or L. as witnesses or to present a "peer contamination" defense.

After the jury convicted defendant on all charged counts against D. and J., defendant fired Chastaine. Defendant retained his attorney from the first trial, Shannon V. Baker. Baker filed a motion for new trial on grounds Chastaine had provided ineffective assistance of counsel. The prosecution opposed the motion.

During a hearing on the motion for new trial, the prosecutor called Chastaine as a witness and elicited the following testimony: For the 28 years prior to trial in this case, Chastaine practiced criminal law. Chastaine and Baker had previously worked together at the same law firm for approximately four years. After the first trial ended in a mistrial, Baker referred the case to Chastaine.

Chastaine testified he has provided legal representation in "a lot of sexual misconduct cases." In preparing for trial in this case, Chastaine spoke with approximately six attorneys including: Jake Stebner; civil attorneys Mark Gallagher and Keith Gable, and several attorneys specializing in federal law charges including Mark

20

Manning and probably Kelly Babineau. Chastaine sought "ideas about the kinds of jury [he] would look for, how people might react to certain information." Chastaine also spoke with Baker "at some length" and during "a number of times." They discussed various witnesses who testified during the first trial. Baker was "active in getting [Chastaine] as much information as she could about this case." Even after the first trial, Baker continued to visit defendant in jail.

Chastaine and Baker discussed strategy for the second trial. For Chastaine, the issue of whether to introduce the testimony of the now victims of uncharged offenses was a difficult decision he viewed "as the key decision. Everything else—every other decision depended on that one." Chastaine spent "a lot" of time making the decision about trial strategy. This was one of the issues Chastaine discussed with the other attorneys.

Ultimately, Chastaine reasoned: "[T]he pros to not calling the other kids and just staying with J[.] and D[.] was I felt that their testimony was sufficiently different than their—the videos that we had, that they could be pretty strongly impeached. And so you just have the two kids and that would be it. To put on the other children would be to basically go through the entire history of [victim L.'s uncharged offense] situation, the rumors, the discussion between all the other kids. Both of those scenarios could be supported favorably potentially by our expert who could talk about both scenarios. But ultimately, obviously I decided to go with what I always call the more streamlined version, just the two kids."

The fact the first jury was hung played a substantial role in Chastaine's decision because he knew the division of jurors was different for the victims charged in the first trial.

The trial court denied the motion for new trial. In pertinent part, the trial court explained that "the defendant asserts that [Chastaine] failed to present evidence of rumors circulating at the school. Although defendant states that there could not have been a tactical reason for trial counsel not to present this evidence, [Chastaine] testified that the tactical reason was that more evidence of rumors ... would have been prejudicial to defendant's case because it would have necessitated presenting the testimony of other students, including possibly the [victims of uncharged offenses]." The trial court further explained, "according to the defendant's motion for new trial, the rumors being spread were that the defendant had rubbed children's stomachs and asked them to find his wallet. Even if that evidence had been introduced, it would still not explain the testimony provided by D[.] and J[.], their descriptions of the act of molestation which entailed shaking of the wallet and the defendant sitting on the chair. [¶] Finally, there was also evidence that defendant had once openly asked students whether they could find his lost wallet which, [Chastaine] did argue was one of the sources of the alleged fabrication. He argued this in his closing argument. He specifically said, 'and that has morphed itself into the nightmare that he finds himself [in] today.'"

## D. Chastaine's Strategic Decision to Present a Streamlined Defense

We reject defendant's argument he received ineffective assistance of counsel on grounds Chastaine did not properly investigate and present a peer contamination defense. Chastaine's testimony established he prepared extensively to represent defendant during the second trial. Chastaine planned the strategy by talking with a half-dozen attorneys, including Baker. Chastaine and Baker discussed strategy for the second trial. Chastaine also reviewed several boxes of documents, read all of the police reports, and watched the SAFE interviews of the victims charged in the second case. And the record clearly demonstrates Chastaine wrestled at length with the decision as to whether to call the uncharged victims as witnesses during the second trial.

Chastaine ultimately made the decision to present a "streamlined" defense that avoided the uncharged victims from being introduced to the jury. This decision was reasonable and resulted from extensive research, consultation, and rumination. As Chastaine noted, introduction of the uncharged victims as witnesses would have required substantial time as to each of their histories with defendant. This strategy risked alienating the jury by consuming large amounts of trial time, introducing potentially sympathetic child victims, and portraying the defendant's misconduct as frequent. The streamlined defense offered the potential of a shorter, more focused defense that clearly targeted the suggestibility of the charged victims. Under the circumstances, Chastaine's decision was reasonable.

Courts have considered claims relating to defense counsel's failure to present specific evidence or witnesses, ask certain questions in direct or cross-examination, and make certain objections to evidence as falling within the realm of trial strategy that should not be second-guessed as a matter of "judicial hindsight." (People v. Beagle (1972) 6 Cal.3d 441, 458, superseded by statute on other grounds as stated in People v. Rogers (1985) 173 Cal.App.3d 205, 208–209.) Given Chastaine's extensive preparation for trial and consideration given to trial strategy, we will not second guess his decision to forego testimony from the uncharged victims.

As Chastaine noted, the decision to engage in a streamlined defense was the lynchpin to the entire defense. Chastaine's trial strategy had the consequence that it did not make sense to introduce a peer contamination defense. As J.'s testimony from the first trial made clear, the only source of the rumors was either L. or M.—both of whom were charged victims only for the first trial. Thus, the peer contamination defense would have incurred the very risks Chastaine reasonably decided to avoid by preventing the jury from seeing other child victims who accused defendant of the same pattern of molestations at the same school, at the same time, as the offenses charged in connection with D. and J. Because Chastaine's trial strategy was reasonable, we reject the contention he was ineffective for failure to prepare for or prepare a peer contamination defense.

We also reject defendant's suggestion Chastaine could have introduced a peer contamination defense without calling any of the uncharged victims as witnesses during the second trial. On appeal, defendant's theory appears to be that a proper defense would have entailed asking J. only about the rumors—not for the hearsay purpose of proving the truth of the rumors about defendant's molestations—but only for the effect they might have had on J. Defendant thus speculates that "a common source for J[.] and D[.]'s 'false memory'" could have been established. In so arguing, defendant does not acknowledge the testimony at the first trial established the common source to be one of the uncharged victims.

Had the defense during the second trial asked about the rumors heard by J. and D. and tried to prove a common source, this would have opened door to the admission of evidence regarding the uncharged victims. The prosecution would have had the opportunity to elicit testimony and argue the common source showed the testimony of charged victims was actually bolstered by the same types of crimes against other children at the club. (People v. Robinson (1997) 53 Cal.App.4th 270, 282–283; People v. Shea (1995) 39 Cal.App.4th 1257, 1267.) Chastaine was not ineffective for making the reasoned decision not to pursue a defense that threatened to portray defendant in an even worse light based on his molestation of multiple children under his care. Because we conclude Chastaine made a reasonable tactical decision to avoid the risk of the jury finding that the uncharged victims indicated defendant's molestations were frequent and with numerous victims, we further conclude Chastaine was not ineffective for not reading the transcripts of these uncharged victims' testimony during the prior trial in order to formulate a peer contamination defense for the second trial. Chastaine was not required to prepare a defense he reasonably decided against.

Vicars, at *7-8.

*Ineffective Assistance of Counsel Legal Standards in an AEDPA Case*

The Supreme Court has clearly spoken of the AEDPA standards in reviewing an ineffective assistance of counsel claim pursuant to Strickland v. Washington, 466 U.S. 684 (1984) in Harrington v. Richter, 562 U.S. 86 (2011); and Cullen v. Pinholster, 563 U.S. 170 (2011). It is not necessary to go further than quoting from those three cases:

To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S.Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S.Ct. 2052.

23

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

\*\*\*\*

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," id., at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, Knowles, 556 U.S., at 123, 129 S.Ct. at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. *The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Harrington v. Richter, 562 U.S. 86, 104-105 (2011) (emphasis added).

Nor is the AEDPA reasonableness finding limited to express legal holdings of the state courts in the case:

Section 2254(d) applies even where there has been a summary denial. See Richter, 562 U.S., at ——, 131 S.Ct., at 786. In these circumstances, Pinholster can satisfy the "unreasonable application" prong of § 2254(d)(1) only by showing that "there was no reasonable basis" for the California Supreme Court's decision. Id., at ——, 131 S.Ct. at 784. "[A] habeas court must determine what arguments or theories ... *could have* supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id., at ——, 131 S.Ct., at 786.

Cullen v Pinholster. 563 U.S. 170, 187-188 (2011) (emphasis added)

In speaking directly to the issue here, and remembering the above injunction on the double deference given to AEDPA cases:

"In other words, counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*. In any ineffectiveness case, a particular

24

decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland v. Washington, 466 U.S. 668, 691 (1984) (emphasis added).[7]

The ultimate questions of effectiveness of counsel are issues of law. Strickland, at 698; Thompson v. Keohane, 516 U.S 99, 111 (1995). However, there may be subsidiary factual findings, e.g., just how extensive was an investigation, subject to section 2254(e) [then subsection [d]. Strickland, at 698.

*Discussion*

   A. Counsel's Decision Not to Introduce Evidence From "Uncharged Children" To Buttress the "False Memory" Theory, and the Investigation Pertinent Thereto

Again, use of the term "uncharged children" is simply a shorthand to reference those children whose abuse accusations were part of the charged counts in the first trial, but whose accusations had been dropped by the prosecution in the second trial. The "charged children" in the second trial were D and J.

Both the trial court and especially the Court of Appeal, referenced trial counsel's "extensive investigation." This is a finding of fact that must be found AEDPA unreasonable by "clear and convincing" evidence. That is, could any reasonable argument be made that this finding is true. The answer is "yes," if one considers the primary part of the investigation to be an extensive thought process as opposed to an encyclopedic review of records.

It is undisputed that counsel did not make an investigation of the entirety of the first trial. Indeed, he did relatively little looking into the transcripts and other evidence of the first trial— 17,000 pages or so. Even trial counsel conclusively determined that he did not think such investigation was necessary when he testified that he would have looked at everything if the four children dismissed from being named in charges in the second case had been part of the charged counts against petitioner. Trial counsel essentially reviewed what he would need to impeach the two "charged children" and expert testimony. The argument made by petitioner herein is

---

[7] To the extent that petitioner reads Weeden v. Johnson, 854 F.3d 1063, 1070 (9th Cir. 2017), to hold that an investigation *must* precede every strategic decision, such a reading is at odds with the very words of Strickland. See text infra.

essentially that counsel made a strategic decision first, which then governed his investigative decision with respect to not investigating all of the children's testimony. Petitioner strongly argues that this is a backwards, unreasonable way of proceeding, and that if counsel had proceeded with full investigative efforts first, he would have inexorably come to the conclusion to reference/introduce the uncharged children's abuse claims bias in the second trial.

Thus, petitioner's argument about an unreasonable finding of the facts is largely inconsequential. The investigative facts are not really in significant dispute. Clearly, trial counsel did not testify that he had reviewed the entire files; indeed, he testified (and declared) that he had investigated relatively few documents of the first trial. So too the opinion of Quin Denvir. The role of this very learned expert was not to find facts, but to opine on the larger question of whether the lack of a full investigation *first* before making a strategic decision, fell far below the standards of reasonable counsel. This is a legal question. This opinion was reviewed (and rejected) by the equally learned trial judge and justices on the Court of Appeal. Moreover, it is undisputed that trial counsel sought out the opinions of other lawyers with respect to issues in the case, although the precise issues discussed were not recollected with any specificity—no dispute here.[8] The real issue here is whether making a strategic decision without having done a complete investigation of the files of the first trial was ineffective assistance, and hence the decisions of the trial court and Court of Appeal were AEDPA unreasonable.

Petitioner relies strongly on Weeden v. Johnson, 854 F.3d 1063, 1070 (9th Cir. 2017), for the proposition that investigation *must* precede strategy decisions. While such is a good general rule, the case cannot be read as one forbidding any determination of strategy before a full investigation of facts which lead to the ineluctable conclusion that the strategy could not be employed. As footnote 7 points out, such a mandatory rule would be contrary to the very words of Strickland. Surely, at times, some strategy decisions can be made without factual investigation because of a palpable, unacceptable risk in the risk-benefit analysis, no matter the ins and outs of all the facts which might be discovered through investigation. As referenced by respondent, even

---

[8] It might be presumed, however, that the key question on how to proceed in the case, whether with a streamlined case, or all the children, would have been a topic discussed.

the Ninth Circuit agrees. "However, it has never explained what amount of investigation is sufficient. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. <u>Matylinsky v. Budge</u>, 577 F.3d 1083, 1093 (9th Cir. 2009) (citations and internal quotation marks omitted); <u>see also</u> <u>Miles v. Ryan</u>, 713 F3d 477, 491 (9th Cir. 2013).

However, in reaching the overall legal issue of ineffectiveness, petitioner's argument has some color to it. There is no other way of looking at the fact that the choice made not to reference the uncharged children made the "false memory" case actually presented rather thin. It consisted of cross-examination of two children on a few points of inconsistency, and a generalized, inferential suggestion by the defense expert that inconsistencies such as these could be explained by false memory creation.[9] And there were troubling-to-the-undersigned conforming aspects of D and J's testimony which might have been aided by further examples of potential falsity in the abuse allegations from others—incidents which D and J might have heard from others—the "rumors"—which were then transformed into memorable events. Both D and J testified to about 5 or 6 abuse occasions in interviews, and then each boy increased the abuse incidents involving themselves to approximately 20-30 in their trial testimony.[10] While one similarity in number might be coincidental, taken collectively, the fact that both the pre-trial and increased trial accusations conformed nearly identically is suggestive of memory contamination. Moreover, the sheer number of abuse allegations if taken collectively, i.e., with the uncharged boys' allegations being included, began to stretch credulity. That is, abuse incidents would nearly have had to have been a daily occurrence, even perhaps multiple times a day.[11]

---

[9] As understood by all "false memory" does not mean intended fabrication on the part of D and J, but rather that young minds can innocently be tainted by suggestion from others such that a fact believed becomes inconsistent with reality.

[10] The undersigned has set previously forth the boys' testimony. The use of pronouns makes it somewhat difficult to understand what specific acts of abuse are being discussed, but the point here is that the numbers are remarkably consistent. The question is—why the consistency. Was it merely coincidence or was it derived from hearsay, rumor, or discussions undertaken by the boys?

[11] Nothing in the record before the undersigned indicates, as respondent appeared to argue in briefing, that the "false memory" and "peer contamination" defenses were separate and exclusive of each other. A false memory has to be created by something be it suggestions by authority [footnote continued]

On the other hand, as found by the trial court and Court of Appeal, no matter how trial counsel tip-toed around the "uncharged children's abuse claims," i.e., just trying to introduce rumors of other abuse allegations, it is undoubtedly true that the prosecution could have sought to introduce, probably successfully, the actual abused claims of the uncharged children to counteract any implied falsity/inaccuracy of the other allegations  Any reasonable person could predict the possibility of disastrous consequences here—petitioner would be viewed a pervert of the highest magnitude drowning out any false memory defense.  Moreover, the defense involving allegations from two children might well be obscured by mini-trials on the abuse allegations of all children. It is one thing to be forced to defend the allegations of six children, as petitioner's skilled first counsel was so faced, and develop a strategy to deal with that situation; it is another to be faced with a situation where only two of the numerous children are left germane to the actual charges.

It is clear from the context of the facts that trial counsel thought extensively of the latter scenario.  He concluded that having the claims of others introduced would be snatching defeat from the jaws of the previous "victory,"—the dropping of the majority of the children's charges against petitioner.  There was at this point, counsel had to have reasoned, no necessity in reviewing the other children's facts in any depth no matter how enticing to a false memory defense they might appear; he wasn't going to use them in any event.  Apparent to counsel was the choice of a rather thin reed of defense to wave before the jury, versus a possible, crushing hammer blow from having all the allegations aired.  As counsel testified at evidentiary hearing, he "agonized" over this decision.

Petitioner's counsel insists that the "terrifically good" verdict in the first trial proves that the appropriate defense was the peer contamination defense, and not the false memory defense without evidence of peer contamination.  However, counsel's argument proves too much. The appropriate perspective of the mistrial in the first trial is not the overall result, but the viewing of

figures or false stories related to them by peers, or which the charged children otherwise learned through hearsay—or both.  Counsel in the first trial had the opportunity to argue both since the uncharged children were part of the case and there was nothing to lose in arguing that children not intentionally fabricating abuse charges were nevertheless influenced by them or their rumors.  The issue here is the risk involved in presenting a case on both theories, or at least evidence of peer contamination, when the uncharged children were not present (at least initially), despite the potential benefit.

28

the mistrial verdicts only vis-a-vis the children in the first trial who were also the named victims (the "charged children") in the retrial. At hearing, counsel related that the verdict count in the case of the charged children revealed that a large majority, or at least a majority, of first trial jurors voted to convict petitioner.[12] This was so despite the fact that the peer contamination theory was front and center in the first trial. In other words, the jurors, for the most part, believed D and J even though the jurors in the first trial were less sure of the credibility of the children who were dropped as named victims in the second trial. Reasonable counsel would have taken this into account in determining whether the peer contamination theory was worth the candle in the second trial given the serious potential damage to be done, and the confusion to be sown in the second trial, by the very probable introduction of other acts of sexual misconduct by petitioner. The risks of the peer contamination theory did outweigh the potential benefits.

Thus, coming to the bottom line, the issue is: could any reasonable jurist believe that counsel's making the strategic decision first, and obviating the remainder of the investigation, be viewed as reasonable. Again, <u>Strickland</u> itself understood there were occasions where a defense could be chosen without full investigation of other options. While there can be disagreement on the topic of the ultimate strategy chosen, or whether as a matter of good practice it is better to err on the side of investigation to better inform the decision, the undersigned finds that a strategy to keep the case confined to the two charged children, one that permitted counsel to truncate the investigation and not waste time, is a strategy reasonable jurists could accept as reasonable.

This is so even though an inference could be drawn that counsel who enlist clients with a "flat fee" arrangement might be unduly tempted to truncate an investigation so that the monetary aspects of the client's representation would not be diluted. Regardless, the specter of the crushing blow would be present in any event.

---

[12] There is no clear count in the record of jurors' verdicts in the first trial. The declaration of Shannon Baker, ECF No. 14-7 at 160, trial counsel in the first trial, indicated her discussion with a juror that several of the boys had nine or so jurors voting for conviction ("three jurors voting for not guilty"). The logical inference to be drawn is that the prosecutor put forth her strongest case in the second trial, i.e., the charged, victim children in the second trial had received the most votes for petitioner's conviction in the first trial. This also makes sense in that the charged children in the second trial were not the alleged, vindictive "rumor creators" discussed in the first trial.

In terms of prejudice, the concept of unreasonable behavior and prejudice merge to a large degree. The less reasonable counsel's decision to not buttress the chosen defense, the more likely that the evidence foregone would have made a difference. It is simply not prejudicial to fail to marshal very problematic evidence. It becomes more prejudicial to fail to present available-by-investigation, strong, probative and relatively risk-free evidence. Because counsel's risk-benefit analysis cannot be declared AEDPA unreasonable, it would be difficult to label it unduly prejudicial.

B. <u>Other Ineffectiveness</u>

1. <u>Failure to Produce Through Cross-Examination Impeachment Evidence of the Charged Children's "Relationship"</u>

Petitioner asserts that it was unreasonable not to impeach the charged children's inconsistencies in testimony and interview statements about their relationship. Showing a close relationship between the children could raise an arguable inference to show that their memories of abuse events were feeding off each other and perhaps were created, but not accurate, memories. The Court of Appeal held:

> Defendant argues Chastaine provided ineffective assistance of counsel because he did not introduce evidence "to establish that D[.] and J[.] were friends and had contact with each other." Defendant further argues this allowed "the prosecutor to argue the children told the truth because they independently reported the same unusual conduct." We are not persuaded.

> A. Whether D. and J. Knew Each Other

> During the first trial, J. testified that D. was two years older. J. stated, "I knew his name, but I didn't really know anything about him. He was never my friend. We never really talked." By contrast, D.'s testimony during the first trial was that they were friends and played together "a lot" while they were at the club. Neither D. nor J. testified regarding the substance of their conversations.

> At the motion for new trial after defendant's conviction, Chastaine testified that during the second trial he was aware D. and J. knew each other and had interactions with each other. Chastaine explained:

> Q [by the prosecution] Assuming D[.] testified that he had never spoken with J [.] about the allegations involving [defendant], did you have anything specifically to impeach that?

A [by Chastaine] Not that I recall.

Q Same question, if J[.] was asked, you know, did you ever speak with D [.] about the allegations—

A I don't believe I had any direct evidence that those two boys had specifically spoken about this issue."

In denying the motion for new trial, the trial court rejected the argument Chastaine had been ineffective for failure to introduce evidence to establish D. and J. knew and interacted with each other. The trial court explained:

"First, impeaching J[.] could have been risky and seen as attacking a small child victim. Second, there is little evidence that they knew each other before they made their allegations. In other words, whether they had an opportunity to jointly discuss their accusations. The questions about D[.]'s interactions with J[.] were not given a time frame. So it is entirely possible that those interactions occurred after the molestations. In other words, in the intervening years between the conduct and the trial. While it appears they went to preschool together, they were in different grades.

"Finally, whether they were friends or played together is somewhat subjective. J[.] could reasonably believe and testify that he was not friends with D[.] or played together, and at the same time D[.] could reasonably believe and testify that they did so because they both attended [the club] at the same time.

"[Chastaine] testified last week that he did not have any direct evidence that these two boys had specifically spoken about the issue in this case to each other. In his closing argument he did argue to the jurors that they both were at [the club] at the same time, even though they were two grades apart.

"[Chastaine] also testified that he had reviewed the SAFE interviews and that the SAFE interviews impeached the trial testimony of J[.] and D[.] and indeed he argued this in his closing argument, and the SAFE interviews were admitted into evidence in the trial that was before me."

B. Chastaine's Failure to Impeach D. and J. Based on Discussions They Might Have Had

Defendant claims evidence showing the victims "were friends and played together at the [club] would be very helpful to the defense, because it could be used to argue the two children had an opportunity to talk about [defendant] and the wallet ruse." We reject the claim.

The evidence supporting a claim of friendship was weak. J. flatly stated he had never been friends with D. and they "never really talked." Thus, the introduction of J.'s unequivocal denials of friendship and even talking much with D. would have undermined the evidentiary value of a defense premised on the victims' exchange of information. And, even though D. might have repeated his claim

31

to have been friends with J., there was no hint in D.'s testimony that the boys ever talked about defendant's wallet ruse. As Chastaine noted in his own testimony, he could not recall any direct evidence the boys had ever discussed defendant's molestations.

For lack of evidence the boys had talked about defendant or his molestations, Chastaine reasonably decided not to launch into a fishing expedition with D. or J. in hopes some discussion about the molestations had occurred. "The failure to impeach a witness or to object to evidence are matters which usually involve tactical decisions on counsel's part and seldom establish a counsel's incompetence.... 'Matters involving trial tactics are matters "as to which we will not ordinarily exercise judicial hindsight...." [Citation.]' " (People v. Frierson (1979) 25 Cal.3d 142, 158, quoting People v. Najera (1972) 8 Cal.3d 504, 516–517.)

Chastaine pursued a defense for which he had concrete evidence, namely the discrepancies between the charged victims' testimony and their statements during the SAFE interviews. This was a less risky defense because of the certainty Chastaine had about differences between the boys' trial testimony and their previously recorded statements. The constitutional right to effective assistance of counsel does not require an attorney to pursue impeachment of child victims that had already been undermined by one of the victim's previous testimony. Accordingly, we reject the contention Chastaine rendered ineffective assistance of counsel for lack of impeachment of D. and J. based on speculation they might have previously discussed the molestations committed by defendant.

Vicars, at *9-10.

The undersigned has some issues with the reasonableness of trial counsel's non-impeachment of the charged children's potential relationship. Again, the "false memories" had to be created by something, and inferential, possible discussions of the children might show a basis for such created memories. The undersigned reiterates that it was troubling that the children had nearly identical testimony about the number of abuse incidents involved—both at first in interviews, and later in the increase of incidents during trial testimony. Moreover, if cross-examination of children is so problematic, why do it all. Counsel was not deemed ineffective for the cross-examination he did perform even if it was "dangerous;" rather he was adept at his cross-examination of the children, and there is no reason to believe he could not have been adept in this area. Finally, whether correctly or incorrectly suppressed, petitioner's expert was not permitted even to testify to any case related basis for the possibility that false memories were created in this

////

case.[13] The more fact-based inferences he could argue, the better as the defense case was, as stated previously—thin. Ultimately, however, the undersigned cannot find that both state courts were AEDPA unreasonable in finding that counsel's "failure to impeach" was a matter of non-actionable tactics.

In addition, the undersigned cannot find that the required demonstration of ineffectiveness prejudice exists in this case, i.e., that confidence in the outcome should be undermined. As pointed out by the trial judge and the appellate court, the matter of "friendship" was subjective as many children could believe that they were friends with all classmates, while others might deem friends to be only closely held relationships. The difference in age of the two children would be important in this respect as well as differences in maturation and development are starker in the younger years leading to a more doubtful "friendship" relationship. The lack of any direct evidence that the charged children spoke to each other about the made impeachment on the matter of friendship is not the "case-breaker,'" petitioner would have the court believe.

2. <u>Counsel's Decision to Forego Some Investigation of Discovery Club Employees and Failure to Present "Lack of Opportunity" Defense/ Evidence</u>

The prosecution presented some witnesses who related, in essence, that petitioner might have had the opportunity to perform the alleged misconduct even though there were a myriad of staff (and sometimes students) in the areas where the misconduct occurred. One particular damaging piece of testimony was one employee's recollection that she had walked into a location where she found petitioner and a child in a potentially compromising position. This evidence was somewhat mitigated by effective cross-examination. Petitioner argued in the state courts that it was ineffective assistance not to bring in available, better witnesses on petitioner's behalf to show

---

[13] As the parties have not raised the issue, the undersigned does not have occasion to review the propriety of the pretrial ruling not permitting petitioner's expert from testifying to any case related specifics which stood out as possible situations which could give rise to false memories. Suffice it to say here that the expert's generalized, non-case related, discussion of the creation of false memories with no application to this case was not especially persuasive. While perhaps it was inappropriate for the expert to offer an ultimate opinion on the creation of false memories in this case, the trial attorney's pointing out the case specific inferences in final argument was a step down in persuasiveness from the expert at least being able to identify potential problem spots in the case.

1    the lack of opportunity.

2         This issue, not referenced directly in the Petition or Traverse, was argued strongly before

3    the Court of Appeal.  However, it must be deemed waived here in that the lack of reference or

4    argument usually ends at that result.   It is beyond dispute that the absence of argument on an

5    issue in a brief establishes waiver of that issue.   <u>Jones v. Wood</u>, 207 F.3d 557, 562 n.2 (9th Cir.

6    2000) (failure to argue an issue in an opening brief).   Issues raised in a party's brief but not

7    specifically argued are likewise deemed abandoned. <u>Acosta-Huerta v. Estelle</u>, 7 F. 3d 139, 144

8    (9th Cir. 1992).

9         In the alternative, if the issue is reached, the Court of Appeal found:

10               Defendant contends E. should have been called to testify defendant
                 "did not regularly leave the playground with the children." And he
11               contends A. should have been called to state she "never saw
                 [defendant] take D[.] and J [.] anywhere" or defendant stay behind
12               with a child during recess. These contentions might have merit if
                 Chastaine were compelled to provide a lack-of-opportunity defense.
13

14   <u>Vicars</u>, at *11.

15         The Court of Appeal went on to recount that the prosecution employee witnesses were not

16   all helpful to a "no opportunity" defense, and that it was reasonable for counsel to reject an

17   "opportunity" defense because the additional witnesses would have essentially been a "wash"

18   rendering the defense not very good.  If the ineffectiveness issue were presently an "opportunity

19   defense in lieu of a false memory defense, or as one distinct and separate from the memory

20   defense, the undersigned can find no fault with this analysis.  However, with due respect, the

21   analysis of the usefulness of the good-for-petitioner employee testimony was not relegated to an

22   all-or-nothing opportunity defense.

23         It is common sense that the less logistical opportunity for abuse incidents to have taken

24   place, the stronger the inference can be argued (along with other evidence) that the children's

25   memories must have been contaminated with situations not actually taking place in reality.  That

26   is, a reasonable juror would begin to question the plausibility of the children's recollections if

27   they seemed logistically far-fetched.   Another way of phrasing it is: how did the children

28   remember what seems to be countered by the logistical difficulty associated with their

34

recollections—perhaps by the creation of a false memory—maybe there was some merit to the expert's general false memory testimony. This is especially true in questioning the logistical viability of upwards of 60 incidents for the two charged children alone. As has been stated on several occasions already, petitioner needed evidence from *whatever* source to substantiate the potential for false memory creation. Thus, the question is not whether the opportunity defense was strong enough as a stand-alone defense; the question is whether such evidence would have been additive in the mind of a reasonable juror who was being asked by the defense to find (at least to a reasonable doubt) that the children had somehow had their memories "falsely created."

As also has been stated previously, the request by the defense to reject children's testimony about abuse incidents is a tall order. This is especially so in a case involving an assertion that the children's testimony to memories actually had no basis in fact—the whole abuse thing was a complete, unfortunate fiction. We all have been subject to constant, repetitive examples involving horrible child abuse. Despite admonitions that the defense starts out without any burden, indeed a presumption of innocence, it is difficult for any person to find after a child's testimony that innocent children, for whatever reason, have testified to completely false memories about the gist of abuse allegations. That is why defense counsel are required to perform necessary investigations, and to present what they can to raise reasonable doubts as to the accuracy of a child's abuse testimony. While the burden of proof always remains on the prosecution, the practically of the matter is that child abuse testimony calls out loudly for a production of rebuttal evidence—if it is available and not problematic in itself. The defense in this case was tasked with marshalling such evidence.

The undersigned cannot find any real downside for counsel to have supplemented his case with testimony which contradicted the attempt by the prosecution to show that petitioner did have chances to do the alleged deeds without being found out, and more importantly, the assistance of employee witnesses could have been argued as a reason to believe that a false memory must have been created. After all, the defense-in-chief consisted of exactly one witness who was not allowed to address the specifics of the case. While these aforementioned favorable, employee defense witnesses would not have won the case with their testimony alone, the testimony would

have assisted in allowing counsel to argue that his expert was correct in raising the specter of false memories, and the children's memories had to be inaccurate or "false," because…. For the above reasons, counsel was AEDPA unreasonable in this regard with respect to his investigation and presentation of witnesses.

The question then becomes was the failure to present these witnesses prejudicial in the ineffective assistance sense, i.e., does it undermine confidence in the verdict. The undersigned cannot find that this omission rises to the level of prejudice required. Firstly, counsel did do a sufficient job on cross-examination of the prosecution witnesses to raise some questions about petitioner's "opportunity." While the omitted witnesses would have helped further, it cannot be said that it was probable that a juror would disbelieve the children in their entirety about any abuse incident taking place per se. The children's testimony was simply too specific and graphic for these employee witnesses to have probably won the day with any juror.

### 3. Miscellaneous Arguments

Petitioner references two other examples of petitioner's ineffectiveness: a failure to object to the prosecutor's undisputedly improper argument, and failure to object to or supplement an ambiguous unanimity jury instruction. The undersigned does not have much to add to the discussion of these issues in addition to what was set forth by the trial court and the Court of Appeal; the analysis of the appellate court follows:

> During the prosecutor's opening statement, she told the jury: "And I am confident that at the end of this [trial] when I stand before you and I ask you to deliver justice to those two boys, that you will do the right thing."
>
> During closing arguments, the prosecutor argued to the jury in pertinent part:
>
> "You know, Dr. O'Donohue makes a ton of money testifying for defense attorneys. Now I'm all for ... you know, the American way and making money and doing the best you can, but the hypocrisy of him having a child center in Nevada, Reno and where he treats victims of molest and he treats victims of sexual assault, but then comes in regularly, hundreds, over hundreds of times and testifies for defendants charged in sex crimes, should make you just a little sick to your stomach.
>
> "But you know he's got a wallet, and he'll travel.

"The defense described him in his opening statement as a man who has dedicated his life to the topic of child abuse.

"Really? Really?

"Because yesterday he was dedicating his life to a woman who was charged with letting a baby die in her day care and that woman's [PTSD]. That was just yesterday." (Italics added.)

The prosecutor also argued to the jury about Dr. O'Donohue's interest in compensation as follows:

"Or what about all the books we talked about? The entrepreneur ideas of a psychiatrist, all of those things?

"He's dedicated his life of figuring out ways to capitalize on his education and his research to make money and he's found it. He has found it. Because he's made approximately $9000 in this case. And he made approximately $9000 yesterday. And he makes approximately $9000 every time a defense attorney calls him."

The prosecutor continued this theme by arguing: "But we also know, although not necessarily asked directly, what we know is that he makes $450 an hour reviewing materials. And we know he made $9000 in this case, some of it for travel, some if it for the testimony today. The rest of it, you have to assume, was reviewing materials in this case and talking to the defense lawyer. That's what he said: I spent a lot of time reviewing materials, speaking to the defense attorney.

"Did he come in here without any preconceived notions about the case like Dr. [Urquiza]? Did he appear to you to be familiar when he would try to slide in a couple little examples that kind of fit the facts of our case?

"He knew the facts of this case. He knew what he wanted to testify about. He knew that would help the defense attorney."

The prosecutor also explored the following reasoning in front of the jury: "I was driving one day, and I saw this—actually, a bumper sticker. It was a tribute to Voltaire. I had to look it up because it just reminded me of my job. [¶] It's those that can make you believe absurdities that can make you commit atrocities. [¶] That's true. If someone can make you believe something absurd, a very, very bad result can happen, a very bad result."

The prosecutor also argued: "Finally, to all jurors comes the awesome realization that there are times in the affairs of men and women, your neighbors and mine, when no law or threat of punishment, however severe, will for a single moment deter or prevent the most frightful explosions of primitive passion and violence. It falls on me to attend at the official cleaning up of the human debris."

In her rebuttal, the prosecutor argued: "[Y]ou are here to do justice,

37

and you are here to deliver justice. [¶] And, we're not talking about justice, the justice that you need to deliver to [defendant]. We're talking about the justice that you are going to deliver to those two little boys who sat in front of you and talked about what happened to them.

B. Review of Claims of Prosecutorial Misconduct During Closing Arguments

Defendant's trial attorney failed to preserve the issues of prosecutorial misconduct by not objecting or requesting the jury be admonished as to any claimed instance of misconduct. Anticipating forfeiture, defendant argues he received ineffective assistance of counsel for lack of objections and requests for admonition by his trial attorney. " ' "To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument." ' " (People v. Charles (2015) 61 Cal.4th 308, 327, quoting People v. Linton (2013) 56 Cal.4th 1146, 1205.) "In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' " (People v. Hill (1998) 17 Cal.4th 800, 820, quoting People v. Bradford (1997) 15 Cal.4th 1229, 1333.)

"Regarding the scope of permissible prosecutorial argument, ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his [or her] case and is not limited to 'Chesterfieldian politeness' " [citation], and he [or she] may "use appropriate epithets...." (People v. Wharton [ (1991) ] 53 Cal.3d [522,] 567–568.)' (People v. Williams (1997) 16 Cal.4th 153, 221.)" (People v. Stanley (2006) 39 Cal.4th 913, 951–952.)

" ' "The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' (People v. Gionis (1995) 9 Cal.4th 1196, 1214; People v. Espinoza (1992) 3 Cal.4th 806, 820.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' (People v. Espinoza, supra, 3 Cal.4th at p. 820.)" (People v. Samayoa (1997) 15 Cal.4th 795, 841.)' " (People v. Hill, supra, 17 Cal.4th at p. 819.)

B. Prosecutorial Misconduct

1. Comments regarding Dr. O'Donohue.

38

The California Supreme Court has held, "Although prosecutorial arguments may not denigrate opposing counsel's integrity, 'harsh and colorful attacks on the credibility of opposing witnesses are permissible. [Citations.]' (People v. Arias (1996) 13 Cal.4th 92, 162 [claimed disparagement of defense expert was not misconduct].) Moreover, a prosecutor 'is free to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent "lie." ' (Ibid. [prosecutor properly implied that defense expert " 'stretch[ed] [a principle] for a buck' "]; see People v. Alfaro [ (2007) ] 41 Cal.4th [1277,] 1328, 63 Cal.Rptr.3d 433 ['it is not misconduct to question a defense expert's veracity'].)" (People v. Parson (2008) 44 Cal.4th 332, 360.)

The prosecutor may also argue that the more defendants for whom an expert witness testifies, the more likely the expert "is not giving his [or her] true opinion in these cases, or that his [or her] analysis is not as trustworthy as it might be." (People v. Buffington (2007) 152 Cal.App.4th 446, 454–455.) Moreover, "[a]s a matter of common sense, the fact that a well-paid expert witness routinely offers opinions in favor of [certain types of] defendants in a great number of cases has some tendency in reason to prove he [or she] is not being entirely objective in formulating his [or her] opinion." (Ibid.) Nonetheless, the prosecutor errs when arguing an expert's testimony in prior cases establishes the expert's bias in the absence of any showing the expert's prior testimony was erroneous or unwarranted. (Id. at pp. 455–456.)

The Attorney General defends the prosecutor's comments about Dr. O'Donohue's testimony as permissible in light of the prosecution's wide latitude during closing arguments. We disagree the prosecutor's comments about Dr. O'Donohue all fell within the range of permissible argument. The prosecutor erred in arguing to the jury that Dr. O'Donohue's repeated testimony on behalf of "defendants charged in sex crimes, should make you just a little sick to your stomach." The prosecutor suggested Dr. O'Donohue was hypocritical in treating victims of sex crimes and testifying on behalf of criminal defendants charged with the same type of crimes. In the same vein, the prosecutor engaged in misconduct by asserting that the day before his testimony, Dr. O'Donohue "was dedicating his life to a woman who was charged with letting a baby die in her day care and that woman's [PTSD]."

The prosecutor should not have suggested Dr. O'Donohue's testimony in the previous case involved "dedicating his life" to a person charged with infanticide. This remark was unaccompanied by any showing the prior testimony was erroneous or unwarranted. So too, the lack of showing regarding any prior mistaken opinions or testimony meant the suggestion of Dr. O'Donohue's hypocrisy in rendering his prior opinions constituted prosecutorial misconduct. In short, the prosecutor erred in engaging in these personal attacks on Dr. O'Donohue.

2. Exhortation to deliver justice to the victims and "cleaning up the human debris."

The United States Supreme Court has held that a prosecutor engages in error "to try to exhort the jury to 'do its job'; that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice ...." (United States v. Young (1985) 470 U.S. 1, 18 [84 L.Ed.2d 1].) Consistent with this guidance, the Fourth District held that a "prosecutor committed misconduct when he argued that defendant hopes that 'one of you' will be 'gullible enough,' 'naïve enough,' and 'hoodwinked' by the defense arguments so that he 'can go home and have a good laugh at your expense.' " (People v. Sanchez (2014) 228 Cal.App.4th 1517, 1529.) As the Sanchez court concluded, "The prosecutor's comments fell outside the bounds of the 'wide latitude' given to prosecutors during argument because the comments were designed to offend and intimidate the potential holdout juror who doubted defendant's guilt." (Id. at p. 1530.) Thus, the prosecutor improperly argued to jurors: "[Y]ou are here to do justice, and you are here to deliver justice. [¶] ... We're talking about the justice that you are going to deliver to those two little boys who sat in front of you and talked about what happened to them."

The prosecutor also erred in referring to her job in the case as "the official cleaning up of the human debris." The prosecutor should not have analogized her role in defendant's trial in this manner. " 'A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his [or her] own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.' " (United States v. Weatherspoon (9th Cir. 2005) 410 F.3d 1142, 1149.)

C. Analysis of Prejudice

As the California Supreme Court has observed, "To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (In re Wilson (1992) 3 Cal.4th 945, 950.) 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (People v. Scott (1997) 15 Cal.4th 1188, 1211–1112, quoting Strickland v. Washington (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674].)

Here, the prosecution's closing arguments comprised 1 hour and 55 minutes. Closing arguments by both sides were lengthy—spanning nearly 100 pages of the reporter's transcript. Based on our review, we conclude the prosecutor's improper remarks were isolated and harmless beyond a reasonable doubt.

////

Although the prosecutor's arguments were improper to the extent we have noted above, the remainder of her statements to the jury were proper. During closing arguments, the prosecutor told the jury not to be swayed by bias or prejudice, to base its decision only on the evidence presented at trial, and jurors' sole prerogative was to determine witness credibility. The prosecutor several times acknowledged parts of Dr. O'Donohue's testimony with which the prosecutor agreed. The prosecution also informed the jury it should evaluate the prosecution and defense's experts in the same way.

The gravamen of the prosecutor's argument was a focus on the evidence presented at trial and repeated indication to the jury that it was the sole trier of fact. Thus, the prosecution conducted an in-depth exploration of the indicia of reliability of early statements by the victims during SAFE interviews. During this focus on the evidence, the prosecution several times referred to the testimony of Dr. O'Donohue in a manner that indicated Dr. O'Donohue's testimony was to be taken seriously but understood to be limited in utility under the facts presented.

The prosecutor's argument did not disparage defense counsel or denigrate the theory of the case advanced by the defense. Instead, the prosecutor argued the defense case simply was not a credible interpretation of the most reliable evidence in this case. Although the prosecutor's mention of "human debris" was improper, this is not a case in which the defendant was demonized or an argument crafted based solely on the nature of the charges. Instead, the prosecutor argued the evidence had to support the charges and defendant's actions met the definition of the charges. In short, the improper statements were overshadowed by permissible argument. The California Supreme Court has held brief misstatements to a jury were harmless when they "constituted only a small portion of [the prosecutor's] larger argument ...." (People v. Collins (2010) 49 Cal.4th 175, 229.) This reasoning applies here and yields the conclusion that the prosecutor's misstatements during closing arguments were not prejudicial. Consequently, defense counsel was not ineffective for failure to object.

Vicars, at *15-18.

It is questionable that reasonable jurors need an instruction to determine the impropriety of such argument. While many times it is appropriate strategy to officially call attention to such tactics, thereby disrupting the offender's final argument and thereby taming it down, the improper argument largely speaks for itself. In any event, the California Court of Appeal's determination is one that reasonable jurists could accept.

Finally, with respect to the asserted, errant jury instruction, counsel testified at evidentiary hearing that he had "dropped the ball" in not objecting to the following instruction:

////

41

Defendant focuses on the following language in CALCRIM No. 3500 as given here: "You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts, and you all agree on which act he committed." In defendant's view, the failure of this instruction to instruct that the jury "had to agree on which act the defendant committed for each offense" rendered it defective.

Vicars, at * 22.

Each count had multiple acts alleged. ECF No 14-6 at 94-101 (Second Amended Information). Generally, the counts alleged that petitioner's body was touched and/or the children's body was touched, all for the purpose of sexual excitement. It stands to reason, given the other instructions set forth above, that a reasonable juror would understand that the jurors collectively would have to agree which act was committed *for a specific count*. Moreover, no party points to any prosecutorial argument which indicated that the jury could find any act true, and such would stand in place of individual count determinations. While the instruction is ambiguous in the abstract, perhaps even improper, it was not so in reality. If the "ball was dropped," it was not dropped very far, and it was quickly caught again by virtue of the additional instructions and lack of any error in arguing such.

*Conclusion*

Although petitioner has the right to be concerned that his defense was unduly truncated in this case, the undersigned cannot find the assertions of trial counsel deficiency to be AEDPA actionable. The petition should be denied.

However, the undersigned recommends that a Certificate of Appealability be issued as petitioner has raised a colorable issue with respect to the lack of investigation and presentation of a peer contamination theory which could have been used to support a false memory defense.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be denied; and

2. The District Court issue a certificate of appealability as to petitioner's issue with respect to the lack of investigation and presentation of a peer contamination theory which could have been used to support a false memory defense.

////

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: June 10, 2019

<u>/s/ Gregory G. Hollows</u>
UNITED STATES MAGISTRATE JUDGE